**Michael LEWANDOWSKI, Plaintiff,**

v.

**Martin MAKEL, Warden, Michigan Dunes Correctional Facility, Defendant.**

**No. 1:89–CV–603.**

United States District Court, W.D. Michigan.

Dec. 21, 1990.

---

James Sterling Lawrence, Detroit, Mich., for plaintiff.

Suzanne L. Wilhelm, Asst. Atty. Gen., Frank J. Kelley, Atty. Gen., Appellate Div., Lansing, Mich., for defendant.

## OPINION

ENSLEN, District Judge.

Under the authority of 28 U.S.C. § 636(b)(1)(B), United States Magistrate Doyle A. Rowland filed a Report and Recommendation in this case on May 29, 1990. He recommended that the petition for writ of habeas corpus be granted and that petitioner be released from prison pursuant to the sentence imposed under his original plea bargain agreement. Petitioner has been serving a mandatory life sentence without parole since 1976.

Abiding by 28 U.S.C. § 636(b)(1), the Court has conducted a *de novo* review, including an evidentiary hearing, of those portions of the Magistrate's report to which plaintiff objects. I agree with Magistrate Rowland's decision, but for different reasons.

It is essential to clearly identify how the Court refers to each of the attorneys involved in petitioner's representation during the time period relevant to this action: 1) "first attorney"—petitioner's initial counsel who rendered fully adequate representation including complete counselling and advice, sought and obtained a plea bargain agreement to second degree murder and assault with intent to murder, and "negotiated" for favorable sentences to run concurrently; 2) "subordinate counsel"—the subsequent counsel who made the initial contact with petitioner, advised petitioner that under Michigan law if he withdrew his plea he could not be tried on the original, greater charge of first degree murder, made the decision to bring in lead counsel who had more experience in criminal litigation, and had the most contact with peti-

tioner, though apparently made none of the strategic decisions in the case; and 3) "lead counsel"—the subsequent counsel who intended to take the case to trial, made the strategic decisions in the case, presented oral arguments, and appears to have had little contact with petitioner.

The facts set forth below are based on the record and on the testimony given in the evidentiary hearing before this Court on December 7, 1990. Due to the time lapse, there are some gaps and conflicts about what happened. The Court is cognizant of this factor. The Court is also aware of the natural tendency for petitioner's testimony to be self-serving. Even so, it remains clear that petitioner's subsequent counsel gave ineffective legal assistance and that it prejudiced the outcome.

### Facts

Petitioner was charged and convicted with the first degree murder of his wife, whom he had shot and killed during a marital dispute in a Port Huron tavern on December 22, 1972.[1] After he and his first attorney thoroughly reviewed the strengths and weaknesses of his case and his options, including their potential consequences, petitioner had initially pled *nolo contendere* to second degree murder.[2] Prior to sentencing, petitioner sent the judge a letter on June 12, 1973 expressing dissatisfaction with his first attorney and requesting to withdraw his plea.[3] It is unclear whether petitioner had consulted with subordinate counsel before sending this letter. Petitioner admits, however, that he wrote and sent it without any attorney's knowledge. At the time of the letter, there was no clear authority under Michigan law as to whether the voluntary withdrawal of a plea to a lesser offense would result in subjecting defendant to the original charge. On

June 18, the state supreme court issued an arguably broad holding in *People v. McMiller*, 389 Mich. 425, 434, 208 N.W.2d 451 (1973), "that upon the acceptance of a plea of guilty, as a matter of policy, the state may not thereafter charge a higher offense arising out of the same transaction."

It has not been established when, but petitioner alleges, and subordinate counsel admits, that at some point in time he advised petitioner of the *McMiller* rule: that should petitioner win the right to withdraw his plea to second degree murder, he could not then be tried on the original charge of first degree murder. Lead counsel was never aware until the spring of 1990, at the hearing before the magistrate, that subordinate counsel had given petitioner this advice.

There may have been some interaction between petitioner and subordinate counsel prior to the letter. However, because *McMiller* was decided after petitioner's letter, it is evident that at least the specific rule in *McMiller* was not a factor in petitioner's initial decision to withdraw his plea.

On July 30, 1973, petitioner appeared before the judge and sought to withdraw his plea and to substitute attorneys. His first attorney only found out about petitioner's desires either the very day of this hearing (which had been scheduled as the date for sentencing), or several days earlier. The first attorney disagreed vehemently with petitioner's desire to withdraw the plea, and the judge gave permission for the attorney to withdraw from the case. The last time petitioner's first attorney was involved with this case was when he met with petitioner's subsequent counsel and reviewed the file.[4]

---

1. Petitioner also shot and injured a man trying to apprehend him fleeing from the site. For this act, petitioner pled guilty to assault with intent to murder. He is not challenging this conviction.

2. Petitioner claims that at the time of agreeing to the nolo plea, he had no memory whatsoever of the event.

3. Petitioner states that when his memory of the killing returned, he became dissatisfied with his plea.

4. Neither the first attorney, nor the subsequent counsel could recall when this meeting occurred, but the first attorney assumed it was prior to subsequent counsel's first appearance in the case on August 6.

Subsequent counsel set up the fee agreement with petitioner and his mother based on the assumption that petitioner's motion would be granted and they would take his case to trial. Lead counsel states that at that time, he assumed the case would go to trial on charges of first degree murder. He testifies that he discussed this fully with petitioner. Subordinate counsel, the one who undisputedly spent the most time with petitioner discussing the case and their strategy, states that after *McMiller* he believed that jeopardy attached to the original charges and that petitioner could only be charged on the lesser offense of second degree murder. Subordinate counsel does not recall, however, at what point he became aware of *McMiller* and exactly when he discussed his interpretation of the case with petitioner.

On August 13 petitioner appeared with subsequent counsel who filed a formal motion to withdraw his plea. The judge denied the motion on August 27 and sentenced petitioner to 15–25 years for second degree murder, the charge to which he had pled *nolo contendere.*[5] His first attorney testified that the sentence was much lighter than that which the judge had initially wanted to impose. The prosecutor on the case testified that he believed that the judge should have imposed a significantly greater sentence for the offense committed.

Petitioner's first attorney and the prosecutor (now a state circuit court judge) described the sentencing procedure in Michigan and as it operated in this case. Sentences are not made part of a plea bargain agreement. However, attorneys can discuss sentencing with the probation officer and with the judge. The prosecutor in this case made it a policy never to involve himself in the sentencing discussions. Consistent with this policy, the prosecutor stayed out of all such discussions in this case. The first attorney, however, testified that he "negotiated" a sentence under the plea conviction with the probation officer and the circuit judge, both of whom initially wanted a sentence of life imprisonment. As a result of the process, petitioner's first attorney and his subsequent counsel knew ahead of time what the sentence would be. In addition, the sentence was communicated to petitioner ahead of time by his mother.

Petitioner appealed the denial of his motion to withdraw the nolo plea to the Michigan Court of Appeals. The court of appeals did not issue an opinion in the case until January 1975. *People v. Lewandowski,* 58 Mich.App. 18, 226 N.W.2d 843 (1975), *on reh'g, People v. Lewandowski,* 60 Mich.App. 455, 231 N.W.2d 392 (1975). In December 1974, shortly before the court of appeals had published its opinion on petitioner's action to withdraw the plea, the Michigan Supreme Court ruled in *People v. Matthews,* 393 Mich. 771, 771 (1974) (per curiam), that upon granting a voluntary withdrawal of a plea, the court should remand the case for proceedings on the *original* charge. *Matthews* arguably limited *McMiller* to cases involving procedural infractions in the plea bargaining process. Because petitioner was claiming no procedural defects in the plea bargaining process, *Matthews* could apply to his case.

Petitioner had sixty days in which to file appeal to the Michigan Supreme Court. Despite having sufficient time in which to discuss the legal ramifications of a successful appeal, both subsequent counsel testify that they filed the appeal in 1975 without even so much as talking with petitioner. They had no contact with petitioner whatsoever between the time the Michigan Court of Appeals issued its opinion and their appeal to the Michigan Supreme Court. Petitioner never knew that subordinate counsel's earlier advice under *McMiller* had been qualified by the supreme court in *Matthews.* Subsequent counsel neither obtained petitioner's specific authority to appeal to the supreme court nor informed petitioner of the developments in the law regarding his rights should the appeal be successful.

---

**5.** The sentence for second degree murder was to run concurrently with the sentence for assault with intent to murder.

On rehearing a few months later, the court of appeals specifically cited the *Matthews* holding in its written opinion and order. *Lewandowski*, 60 Mich.App. at 456, 231 N.W.2d 392. Despite such direct notice that the supreme court might apply the *Matthews* decision to petitioner's case should he be successful in withdrawing his plea, both subsequent counsel admit that they still never advised petitioner of the development in the law or the implications it had for the outcome of the appeal. Subordinate counsel's advice to petitioner—that should he be successful in withdrawing his plea, he would not have to face charges of first degree murder—was never qualified.

The Michigan Supreme Court reversed the court of appeals' decision and remanded the case for proceedings based on the original charge of first degree murder. *People v. Lewandowski*, 394 Mich. 529, 232 N.W.2d 173 (1975). Petitioner was rearraigned on the original charge of first degree murder, but before trial he filed a motion to reduce the charge from first degree murder to second degree murder. The court denied the motion.

During the pretrial stage, lead counsel sought an offer for a plea on numerous occasions. The assistant prosecutor (now a federal district court judge) states that he believed at the time that lead counsel was merely going through the motions in seeking a plea. Petitioner authorized lead counsel to negotiate a plea, but lead counsel states that his primary job, as instructed by his client, was to take the case to trial.

The prosecutor and lead counsel testified that on the day before the jury was to be chosen, the prosecutor offered a second plea bargain. While both subsequent counsel, the petitioner, and the assistant prosecutor (who was to try the case) were sitting in the courtroom following some last minute motion arguments, the prosecutor strode into the room and announced to lead

counsel: "You can have second degree." Petitioner himself responded that the state's offer was rejected. Neither of the subsequent counsel said anything.

Unlike the first plea bargain offer, the second offer included no reference to the conviction for assault with intent to murder, the sentence for which petitioner was currently serving. Whether the sentences for the two crimes would be concurrent was not discussed at all. Nor was there any discussion about sentence. Again, lead counsel did not analyze with petitioner the benefits and drawbacks of accepting the plea in light of the risks of going to trial. He simply accepted petitioner's rejection, and without advice to petitioner, proceeded to trial. Petitioner was subsequently convicted of first degree murder. He received the mandatory sentence of life imprisonment without parole.

Claiming that he was denied effective assistance of counsel, petitioner appealed the conviction. The Michigan Court of Appeals affirmed the lower court's conviction, and the Michigan Supreme Court denied leave to appeal. *People v. Lewandowski*, 432 Mich. 876, 436 N.W.2d 660 (1989).[6] Petitioner filed this action for a writ of habeas corpus,[7] arguing that the conviction should be overturned because he was unconstitutionally denied effective assistance of counsel. In this petition for writ of habeas corpus, unlike most before me, there is only one claim: ineffective assistance of counsel. Petitioner does not challenge, and this opinion in no way implicates, the conduct of either the state judiciary or the state prosecution.

### Standard

The Sixth Circuit holds that an attorney's advice to her client to reject a plea offer and go to trial implicates the sixth amendment and the *Strickland* standard. *Turner v. State of Tennessee*, 858 F.2d 1201, 1205 (6th Cir.1988), *vacated on other*

---

6. Levin and Archer, JJ., dissented to the court's decision to deny leave to appeal. They would have remanded the case for an evidentiary hearing and findings of fact to determine if defendant was denied effective assistance of counsel.

7. This is petitioner's fourth petition for a writ of habeas corpus. The other three were brought on different grounds. Answer to Petition at 8–9.

grounds, —— U.S. ——, 109 S.Ct. 3208, 106 L.Ed.2d 559 (1989). The court's rationale is that plea bargaining is a critical stage of litigation proceedings and the decision whether to accept the plea is a vitally important choice. *Id.* (citations omitted).

In this case, there is no clear evidence that subsequent counsel advised petitioner to withdraw his plea, but it is undisputed that subordinate counsel advised petitioner that should he be successful on appeal, he would not then have to go to trial on the original first degree murder charges. I believe that counsel's advice and later failure to advise or inform, which were such determinative factors in the plea bargaining process, must be evaluated under the standards governing petitioner's constitutional rights to effective assistance of counsel.

The United States Supreme Court established the standard for determining ineffective assistance of counsel in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The fundamental concern is whether counsel's conduct interfered with "the ability of the adversarial system to produce just results." *Id.* at 685, 104 S.Ct. at 2063. The Court created a two-pronged test to aid in the lower courts' determinations: 1) defendant must show that counsel's conduct was so deficient as to fall below "an objective standard of reasonableness," *id.* at 687–88, 104 S.Ct. at 2064–65; and 2) defendant must prove that there is a "reasonable probability" that counsel's conduct prejudiced the outcome— ie. "a probability sufficient to undermine confidence in the outcome," *id.* at 694, 104 S.Ct. at 2068. To demonstrate prejudice, petitioner must present more than subjective evidence of intent. Petitioner must set forth objective evidence that had he received competent legal assistance, the outcome would have been different. *Turner,* 858 F.2d at 1206.

*Discussion*

■ The first issue is whether counsel's advice, or failure to advise, fell below objective standards of conduct. The Court makes three findings of fact: 1) after the Michigan Court of Appeals denied his appeal, neither of petitioner's subsequent attorneys obtained his explicit authorization to appeal to the Michigan Supreme Court; 2) neither of petitioner's subsequent attorneys explained and discussed the state of the law as it existed in early 1975 regarding petitioner's rights and risks should he be successful in his appeal to the supreme court; and 3) during pretrial in 1976, subsequent counsel, again, failed to inform and advise petitioner regarding potential plea negotiation options versus the risks of trial.

Clearly, these failures fall below objective standards of reasonable conduct for an attorney advising his client and keeping the client informed about critical decisions. *See Turner,* 858 F.2d at 1205. In this case, on these facts, counsel had the duty to inform petitioner of the status of the law, so that he could make an informed decision whether to accept his conviction under the plea or to appeal to the Michigan Supreme Court. When petitioner had been advised in 1973 that applicable law would result in one outcome and it became apparent in 1975 that in fact application of the law would most likely result in a different outcome, one or both of the subsequent counsel had a duty to so inform petitioner. Without such knowledge and explicit advice, petitioner could not effectively exercise his right to make decisions regarding his acceptance or rejection of a plea bargain offer. Even if given the opportunity, petitioner would have been unable to make an informed decision in 1975 whether to apply for review by the state supreme court or to drop his appeal and serve his 15–25 year sentence for second degree murder to which he had pled guilty in 1973.[8]

---

**8.** Subsequent counsel's duty to advise petitioner in 1975 as to the potential legal risks involved with the decision whether to appeal his conviction under the plea so that he could tell his story at trial is analogous to the criminal lawyer's duty to fully inform and advise a client regard-

ing the risks and benefits of his desire to testify in his own behalf at trial because subsequent counsel testified that they were simply following petitioner's desire to "let him tell his story to the community." While most litigants, in my experience, want to tell "their side of the story,"

Indeed, counsel's failure to inform the client of significant aspects of the law regarding the risks of an appeal may constitute incompetent legal assistance in all circumstances, especially when the client's liberty is at stake. Without such information, a client cannot effectively assist his attorney in his representation at a critical stage in the proceedings. Attorneys have the responsibility not only to keep abreast of the significant developments in the law themselves, but to communicate those changes to their clients.

■ The next issue is whether petitioner met his burden of showing that counsel's substandard conduct prejudiced the outcome of his case—ie., that but for counsel's failure to advise him of the risks of a successful appeal and to seek his authorization, he would not have appealed. Having received incompetent legal assistance, petitioner went to trial on charges of first degree murder, and was convicted. Petitioner does not have to show that the outcome definitely would have been different. Under *Strickland,* petitioner must show that if he had received competent legal assistance, there is a *reasonable probability* that the outcome would have been different.

Petitioner's argument is that a second plea bargain was never offered to him and the outcome of his case was prejudiced because, had he been told of the *Matthews* result, he would not have pursued his appeal to the Supreme Court. Consequently, petitioner argues that he would have completed serving his 15–25 year sentence under the original conviction for second degree murder before the hearing in this Court on his habeas petition. Due to counsel's incompetence, petitioner argues, he was faced with charges of first degree murder and is instead serving a sentence of mandatory life without parole.

The state's argument is that petitioner had decided, at least from the time he first wrote the judge, that he hoped for a verdict of manslaughter. Petitioner believed, the state argues, that he was not guilty of murder and wanted to go to trial so he

could "tell his story to a jury of his peers in the community." Petitioner admits those were his feelings in 1973. The government argues those feelings never changed and that no matter what counsel advised him regarding the consequences of his appeal, he wanted to pursue it to have his day in court. Reflective of his obstinate refusal to compromise, the state argues, is petitioner's rejection of the second offer to plea to second degree murder.

I find that petitioner has satisfied his burden of demonstrating a reasonable probability that, but for the incompetent legal assistance, he would not have gone to trial on charges of first degree murder. In 1973, the first year after killing his wife, Michigan criminal law was in a state of flux. As petitioner began to recall the events leading up to the shooting of his wife, petitioner decided that he wanted to withdraw his plea of *nolo contendere* to the killing because he believed he could convince a jury that he did not really intend to kill her. There is no dispute that, in 1973, petitioner hired his new attorneys to help him withdraw his plea to second degree murder so that he could go to trial, tell his story to a jury of his peers from the community, and try to win a verdict of manslaughter. What is not as clear is whether he met with one of those attorneys to discuss withdrawing his plea prior to writing the judge that he wanted to withdraw.

During these early proceedings, petitioner received contradictory advice as to the risks involved in withdrawing his plea. Although his first attorney and one of his subordinate counsel advised him in 1973 that should he be successful in withdrawing his plea, he would be subject to charges of first degree murder, the subsequent counsel counselled him that should he win, he would only face a charge of second degree murder. The subordinate counsel is undisputedly the attorney who met with petitioner most often. Petitioner's uncertainty as to the risks involved in withdrawing the plea remained throughout the ap-

critical legal advice is required by counsel be-    fore such desire is executed.

proximately two-year appellate process. Petitioner's subsequent counsel did not inform him that the appellate court advised in 1975 that *Matthews* applied to his case and that petitioner would be subject to charges of first degree murder if he withdrew his plea. Petitioner's subsequent counsel did not even seek his authorization to appeal to the Supreme Court in 1975. They acted under the authorization petitioner had given in 1973 before they appealed to the appellate court. If petitioner had had the benefit of this advice—if petitioner had been given the opportunity to discuss and understand the state of the law in 1975 at the time when he had a critical decision to make, i.e., whether to appeal his conviction—I believe there is a reasonable probability that petitioner would not have bull-headedly pursued the appeal to the Michigan Supreme Court.

Petitioner's rejection of the second offer to plea is not relevant to the determination of what petitioner would have done if informed of the risks earlier in 1975 when he could have still gone through with his original plea. The risks were different and, again, petitioner was not fully informed or advised. If petitioner had abandoned his appeal, he would have continued with the 15–25 year sentence under the original plea to second degree murder. The sentence for his plea to assault with intent to murder was to run concurrently. Under the good time laws, petitioner would have been eligible for parole, at the latest, on May 2, 1989. If, when later faced with the actual charge of first degree murder, petitioner had accepted the alleged second offer to plead guilty to second degree murder, the length of sentence would have been unknown, and there is a real possibility it could have been significantly longer. Moreover, it included no agreement regarding the conviction for assault with intent to murder. What petitioner allegedly did in that situation is not necessarily reflective of what he would have done if informed earlier, or if subsequent counsel had discussed and analyzed the "new" offer. At the minimum, subsequent counsel had the obligation to flesh out the "new" offer for petitioner, i.e., what did it mean? Was the

second degree offer to run concurrently or consecutively with the assault conviction? What would be the probable sentence? Was it still possible to negotiate a sentence, as had been done in the first instance? It would be difficult for subsequent counsel to give petitioner advice when they didn't even know what the "new" offer entailed.

This case turns on the motivations, desires, and outlook of petitioner: armed with accurate information as to the state of the law, would petitioner have abandoned his appeal, accepted a conviction of second degree murder, and served his term? I cannot read the minds of the parties. The significant events of this case took place more than fifteen years ago. It is impossible to know for certain the truth or the falsity of petitioner's recent testimony about what he would have done so many years ago, had he been properly informed.

Wisely, the Supreme Court has not given me such an impossible task. The standard is "reasonble probability" and the question to answer is: Can it be said that, had counsel properly informed petitioner, there is a reasonble probability the outcome would have been different? All of petitioner's lawyers in the early proceedings at issue have testified that in 1973 he wanted his day in court and that he hired counsel to withdraw the plea. Counsel has testified that was his job. Petitioner testified that was what he wanted at the time. However, what did petitioner want more than two years later? Was he as adamant about telling his story? Had the reality of spending years in jail begun to hit home? Would he have been more willing to compromise in order to guarantee his freedom at an earlier date? What did petitioner want when his subsequent counsel filed an appeal to the Supreme Court without his specific authorization and without informing him of the legal developments since 1973? These questions are left unanswered because petitioner's attorneys did not even talk with him before appealing to the Michigan Supreme Court.

I find that there is, at least, a reasonable probability that had petitioner's counsel sought his authorization and properly in-

formed him of the state of the law and the risks that he faced should his appeal be successful, the outcome would have been different. When clearly advised as to the risks involved with going to trial on charges of first degree murder, petitioner had entered a plea once.

After petitioner decided on his own to withdraw the plea, he received clear legal advice that should he be successful, jeopardy would attach and he would never have to face charges of first degree murder. The attorney never qualified this advice. With competent legal counsel and advice, it is reasonable to believe that when faced with the real possibility of going to trial on first degree murder, petitioner would have changed his mind and withdrawn his appeal to vacate his plea. I conclude that the record contains objective evidence "sufficient to undermine confidence in the outcome." *Turner*, 858 F.2d at 1206. Accordingly, I grant the petition for a writ of habeas corpus in this case and vacate the state conviction and sentence for first degree murder.

### Remedy

■ The Supreme Court finds that specific performance of a plea agreement is a "constitutionally appropriate" remedy. *Mabry v. Johnson*, 467 U.S. 504, 511 n. 11, 104 S.Ct. 2543, 2548 n. 11, 81 L.Ed.2d 437 (1984). In this case, specific performance of the original plea agreement, including the sentence which the judge imposed under the agreement, restores petitioner to the position he was in prior to counsel's substandard legal assistance.

The state suggested three alternative remedies: 1) send petitioner back to St. Clair County for prosecution with a clean slate; 2) send petitioner back to St. Clair County to negotiate a new plea with the prosecutor; or 3) instruct the prosecutor to offer a plea to second degree murder, but with no direction regarding the sentence. All of these alternatives imply that the state prosecutor or judiciary were somehow legally deficient, thereby rendering the original plea bargain unlawful. Such is clearly not the case.

Petitioner's conduct in prison has been excellent. If petitioner had served the maximum number of years under the original plea and sentence, pursuant to Michigan law and the "good time" credits, petitioner would have been eligible for parole on May 2, 1989, *at the latest*, and most probably would have been released earlier. For these reasons, I hold that the original conviction of second degree murder and sentence of 15 to 25 years should be reinstated. Petitioner should be freed from confinement as of this date.